No. 25-2275

# In the United States Court of Appeals For the Seventh Circuit

JOHN P. TOMKINS,

*Appellant,*

v.

BRIAN LAMMER, WARDEN

*Appellee.*

On Appeal from the United States District Court
for the Northern District of Illinois (3:25-cv-50254)

## BRIEF OF PUBLIC JUSTICE AND THE MACARTHUR JUSTICE CENTER AS *AMICI CURIAE* IN SUPPORT OF APPELLANT

<div style="display:flex">

Amit Jain
RODERICK & SOLANGE
MACARTHUR JUSTICE CENTER
501 H Street NE, Suite 275
Washington, DC 20002
(202) 869-3434

Leah M. Nicholls
  *Counsel of Record*
Ana M. Builes
Lavanya Prabhakar
PUBLIC JUSTICE
1620 L St. NW, Ste. 630
Washington, DC 20036
(202) 470-1061
lnicholls@publicjustice.net

Jacqueline Arkush
PUBLIC JUSTICE
14th St., Ste. 610
Oakland, CA 94612
(510) 622-8150

</div>

*Counsel for Amici Curiae*

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>25-2275</u>

Short Caption: <u>Tomkins v. Lammer</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   ☑   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Public Justice</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Roderick & Solange MacArthur Justice Center</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)      Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Leah M. Nicholls</u>    Date: <u>March 24, 2026</u>

Attorney's Printed Name:  <u>Leah M. Nicholls</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑  **No** ☐

Address:  <u>1620 L St NW, Suite 630 Washington, DC, 20036</u>

Phone Number: <u>202-797-8600</u>    Fax Number: _____

E-Mail Address: <u>lnicholls@publicjustice.net</u>

rev. 12/19 AK

**TABLE OF CONTENTS**

Appearance Disclosure Statement...............................................................................i

Table of Authorities ....................................................................................................ii

Interest of Amici Curiae ..........................................................................................viii

Introduction and Summary of Argument ................................................................. 1

Argument ..................................................................................................................... 3

      I.      Federal Prisoners Must Have A Venue For Vindicating
            Constitutional Claims ............................................................................. 3

      II.     To Vindicate Their Constitutional Rights, Federal Prisoners
            Must Have Access To Mail ..................................................................... 9

Conclusion ................................................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Armstrong v. Exceptional Child Center, Inc.*,
    575 U.S. 320 (2015) ...................................................................... 2, 5

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................... 2, 9

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*,
    403 U.S. 388 (1971) ..............................................................*passim*

*Bounds v. Smith*,
    430 U.S. 817 (1977) .................................................................. 14, 15

*Carlson v. Green*,
    446 U.S. 14 (1980) ........................................................................... 7

*Carroll v. Safford*,
    44 U.S. (3 How.) 441 (1845) ....................................................... 6, 9

*Coleman v. Thompson*,
    501 U.S. 722 (1991) ......................................................................... 14

*Conner v. Reagle*,
    82 F.4th 542 (7th Cir. 2023) ...................................................... 14, 15

*Correctional Services Corp. v. Malesko*,
    534 U.S. 61 (2001) ............................................................................. 5

*Davis v. Passman*,
    442 U.S. 228 (1979) ........................................................................... 7

*Franklin v. Gwinnett County Public Schools*,
    503 U.S. 60 (1992) ............................................................................. 5

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*,
    561 U.S. 477 (2010) ........................................................................... 5

*Gaines v. Lane*,
    790 F.2d 1299 (7th Cir. 1986) ......................................................... 15

*Glaus v. Anderson*,
    408 F.3d 382 (7th Cir. 2005) ................................................. 3, 7, 8, 9

*Goldey v. Fields,*
606 U.S. 942 (2025) ................................................................. 7

*Harris v. Nelson,*
394 U.S. 286 (1969) ................................................................. 9

*Houston v. Lack,*
487 U.S. 266 (1988) ............................................................... 16

*Ex parte Hull,*
312 U.S. 546 (1941) ............................................................... 14

*Kendall v. United States ex rel. Stokes,*
37 U.S. (12 Pet.) 524 (1838) ................................................... 5

*Lewis v. Casey,*
518 U.S. 343 (1996) ............................................................... 15

*Little v. Barreme,*
6 U.S. (2 Cranch) 170 (1804) ................................................... 5

*Marbury v. Madison,*
5 U.S. (1 Cranch) 137 (1803) ............................................... 1, 4

*Martin v. Brewer,*
830 F.2d 76 (7th Cir. 1987) ................................................... 10

*Martin v. Hunter's Lessee,*
14 U.S. (1 Wheat.) 304 (1816) .............................................. 4, 5

*Nelson v. Carland,*
42 U.S. 265 (1843) ................................................................. 4

*Osborn v. Bank of United States,*
22 U.S. (9 Wheat.) 738 (1824) ................................................. 6

*Procunier v. Martinez,*
416 U.S. 396 (1974) ............................................................... 11

*Ray v. Clements,*
700 F.3d 993 (7th Cir. 2012) ................................................. 16

*Rowe v. Shake,*
196 F.3d 778 (7th Cir. 1999) ............................................... 9, 14

*Thornburgh v. Abbott,*
490 U.S. 401 (1989) ......................................................... 3, 9, 11

iv

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ............................................................... 3

*Turner v. Safley,*
482 U.S. 78 (1987) ................................................................ 1

*Wolff v. McDonnell,*
418 U.S. 539 (1974) ............................................................. 14

*Ziglar v. Abbassi,*
582 U.S. 120 (2017) ........................................................... 2, 8

**Statutes**

28 U.S.C. § 2241.............................................................. 1, 3, 7

28 U.S.C. § 2244(d)(1) ......................................................... 15

28 U.S.C. § 2255(f) ............................................................. 15

28 U.S.C. § 2679(b)(2)(A) ...................................................... 7

**Other Authorities**

1 Annals of Cong. 457 (1789) (Joseph Gales ed., 1834)................................ 4

1 Joseph Story, *Commentaries on Equity Jurisprudence as Administered in England and America* § 49 (14th ed. 1918) ................................ 6

3 William Blackstone, *Commentaries on the Laws of England* (1768).................... 1, 4

7th Cir. R. 25(b) ............................................................... 15

Aala Abdullahi, *My Year of Reading Letters From Prisoners*, Marshall Project (Dec. 16, 2024), https://www.themarshallproject.org/2024/12/16/prison-penpal-jail-letters-mail ............................................... 10

Alice Galley et al., *New Prison Mail Policies Reduce Already Limited Connections for Incarcerated People*, Urban Institute (Dec. 19, 2022) https://www.urban.org/urban-wire/new-prison-mail-policies-reduce-already-limited-connections-incarcerated-people [https://perma.cc/9MS5-PNBB]................................................ 10

Ben Blatt, *F.C.C. Changes Course on the Price of Prisoners' Phone Calls*, N.Y. Times (Oct. 28, 2025) ), https://www.nytimes.com/2025/10/28/upshot/prisoners-phone-calls-prices.html ................................................................................. 13

Byron R. Johnson, *Religious Participation and Criminal Behavior, in Effective Interventions in the Lives of Criminal Offenders* (J.A. Humphrey & P. Cordella eds., 2014) ................................... 11

Catherine T. Struve, *The Federal Rules of Inmate Appeals*, 50 Ariz. St. L.J. 247 (Spring 2018) ........................................................ 16

Christopher P. Salas-Wright *et al.*, *Buffering Effects of Religiosity on Crime: Testing the Invariance Hypothesis Across Gender and Developmental Period*, 41 Crim. Just. & Behav. (2014)........................ 12

Danielle C. Jefferis, *RIP Bivens*, 103 Neb. L. Rev. 1 (2024) ....................................... 7

Fed. Bureau of Prisons, *Community Ties*, https://www.bop.gov/inmates/communications.jsp ............................... 13

Fed. Bureau of Prisons, *Work Programs*, https://www.bop.gov/inmates/custody_and_care/work_programs.jsp .................. 13

Fed. R. App. P. 4(c) ......................................................... 16

Fed. R. App. P. 25(a)(2)(A)(iii) ............................................. 16

Haley Ryan, *Thomson Prison on Lockdown Since Sunday*, KWQC (Mar. 11, 2025), https://www.kwqc.com/2025/03/11/thomson-prison-lockdown-since-sunday/........................................................ 13

Ill. Sup. Ct. R. 12(b)(6)..................................................... 16

Leah Sakala, Prison Pol'y Initiative, *Return to Sender: Postcard-Only Mail Policies in Jail* (Feb. 7, 2013), https://www.prisonpolicy.org/postcards/report.html............................ 11

Leah Wang, *Research Roundup: The Positive Impacts of Family Contact for  Incarcerated People and Their Families*, Prison Policy Initiative (Dec. 21, 2021), https://www.prisonpolicy.org/blog/2021/12/21/family_contact/ [https://perma.cc/M7PV-ZM9Q] .............................................. 10

Margo Schlanger, *Trends in Prisoner Litigation, as the PLRA Enters Adulthood*, 5 UC Irvine L. Rev. 153 (2015) ......................................... 14

Mark D. Gough & Emily S. Taylor Poppe, *(Un)Changing Rates of Pro Se Litigation in Federal Court*, 45 L. & Soc. Inquiry 567 (August 2020)...................................................................................... 14, 15

N.D. Ill. R. 5.2(a) ............................................................................. 15

Stephen I. Vladeck, *The Disingenuous Demise and Death of Bivens*, 2019-2020 Cato Sup. Ct. Rev. 263 (2020) ...................................... 2, 6, 7

The Federalist No. 43 (James Madison) (Clinton Rossiter ed., 1961) ........................ 3

The Federalist No. 78 (Alexander Hamilton) (Clinton Rossiter ed., 1961)................................................................................................ 3

Thomas P. O'Connor & Michael Perreyclear, *Prison Religion in Action and its Influence on Offender Rehabilitation*, 35 J. Offender Rehab. (2002) ............................................................................................. 11

*Thomson Prison Suspends Visitation After Whooping Cough Case*, KWQC (Aug. 1, 2025), https://www.kwqc.com/2025/08/01/thomson-prison-suspends-visitation-after-whooping-cough-case/ ...................................... 13

U.S. Const., art. III, § 2 ...................................................................... 5

U.S. Dep't of Justice, *Institution Supplement TOM 5267.09J: Visiting Regulations* (June 24, 2025), https://www.bop.gov/locations/institutions/tom/tom_visit.pdf............................. 13

U.S. Dep't of Justice, *Program Statement P5264.08: Inmate Telephone Regulations* (Jan. 24, 2008), https://www.bop.gov/policy/progstat/5264_008.pdf ............................................. 13

U.S. Sup. Ct. R. 29.2 ........................................................................ 16

United Nations Office on Drugs and Crime, Handbook on Prisoner with Special Needs 36, 52, 73, 116 (2009), https://www.unodc.org/pdf/criminal_justice/Handbook_on_Prisoners _with_Special_Needs.pdf................................................................. 12

Walter Pavlo, *Federal Inmates Find Themselves Far From Home Despite First Step Act*, Forbes (Sept. 25, 2025), https://www.forbes.com/sites/walterpavlo/2025/09/25/federal-inmates-find-themselves-far-from-home-despite-first-step-act/........................... 13

**INTEREST OF *AMICI CURIAE*[1]**

*Amici* are nonprofit organizations with significant experience representing the interests of incarcerated people in state and federal courts. *Amici* file this brief to provide the Court with an explanation of why its decision in *Glaus v. Anderson*, 408 F.3d 382, 386 (7th Cir. 2005), is incompatible with both Founding-era Article III principles and *Bivens* itself, and the importance of mail access for incarcerated persons to vindicate their constitutional rights.

**Public Justice.** Public Justice is a nonprofit legal advocacy organization that specializes in socially significant civil-rights litigation. The organization's Access to Justice project advocates to remove procedural obstacles that unduly restrict the ability of people whose civil rights have been violated to seek redress in courts. In addition to representing incarcerated persons seeking to vindicate their right to mail in particular, Public Justice has filed *amicus* briefs advocating for the right of incarcerated persons to have access to courts more generally.

**Roderick and Solange MacArthur Justice Center.** The Roderick and Solange MacArthur Justice Center ("RSMJC") is a civil rights organization founded in 1985 by the family of J. Roderick MacArthur to advocate for human rights and social justice through litigation. RSMJC attorneys have played a key role in many civil rights battles concerning the treatment of people who are incarcerated. In addition to direct representation on behalf of clients, RSMJC frequently files *amicus*

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amici* or their counsel made a monetary contribution to its preparation or submission. Appellant has consented to this filing; Appellee has not yet made an appearance.

briefs related to the rights of, and remedies available to, incarcerated persons throughout the federal circuits and in state supreme courts.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). But that is, in practical effect, what FCI Thomson's restrictive mail policy has done. By arbitrarily imposing limits on prison mail—banning correspondence of more than five pages, anything sent in a manila envelope, and any envelope with labels—the prison has made it all but impossible for incarcerated persons to receive legal correspondence. That is what happened to Mr. Tomkins: He was denied access to the courts when FCI Thomson refused to deliver a court order on his motion for compassionate release, resulting in Mr. Tomkins losing his right to appeal that order. And he was denied access again when the district court refused to let him challenge FCI Thomson's mail policy through a petition for a writ of habeas corpus under 28 U.S.C. § 2241.

Holding that federally incarcerated persons can challenge the conditions of their confinement is consistent with the Founding-era "principle, that every right, when withheld, must have a remedy, and every injury its proper redress." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 147 (1803). The Framers wrote Article III of the Constitution to ensure courts had the broad, equitable power to ensure "where there is a legal right, there is also a legal remedy." *Id*. at 163 (quoting 3 William Blackstone, *Commentaries on the Laws of England*, at 23 (1768)). That equitable power "reflects a long history of judicial review of illegal executive action, tracing back to England," by which courts used their equitable power to provide injunctive relief against

1

"violations of federal law by federal officials." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015).

It is also consistent with *Bivens* itself. In *Bivens*, the Supreme Court considered whether to recognize an *additional*, implied cause of action for damages directly under the Fourth Amendment. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 389 (1971). The government argued it was not necessary to do so because there already existed an alternative, adequate remedy under state tort law. *Bivens*, 403 U.S. at 390. But no one in that case disputed the broader principle that the courts had "the power—and obligation" to afford relief for constitutional violations. Stephen I. Vladeck, *The Disingenuous Demise and Death of Bivens*, 2019-2020 Cato Sup. Ct. Rev. 263, 271 (2020). And the availability of habeas, in particular, to challenge conditions of confinement in federal facilities was one of the reasons that the Supreme Court in *Ziglar v. Abbassi*, 582 U.S. 120 (2017), refused to extend *Bivens* to such claims. This Court should take up *Ziglar*'s invitation and hold that habeas relief, authorized under statute, remains available as an equitable backstop for federal prisoners where federal common law, like *Bivens*, has become "disfavored." *Ziglar*, 582 U.S. at 135 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)).

Ensuring that Mr. Tomkins has a remedy for his constitutional violation is all the more important because access to mail is critical to both carceral rehabilitation and access to courts. As the Supreme Court recognized long ago, "the weight of professional opinion seems to be that inmate freedom to correspond with outsiders

2

advances rather than retards the goal of rehabilitation." *Procunier v. Martinez*, 416 U.S. 396, 412 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989). And legal mail is entitled to even greater protection because mail is often the only way incarcerated persons can access courts. A mail policy as arbitrarily restrictive as FCI Thomson's risks shutting the courthouse doors entirely to incarcerated persons like Mr. Tomkins.

For these reasons, the Court should revisit *Glaus v. Anderson*, 408 F.3d 382 (7th Cir. 2005) and hold that Mr. Tomkins's habeas petition can proceed.

## ARGUMENT

### I.     Federal Prisoners Must Have A Venue For Vindicating Constitutional Claims.

**A.** "The principle that the violation of an individual right gives rise to an actionable harm was widespread at the founding, in early American history, and in many modern cases." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 448 (2021) (Thomas, J., dissenting). To the Framers, this principle—where there is a constitutional right, there must be a judicial remedy—was essential to ensuring that the Constitution was delineating a government of limited powers. *See* The Federalist No. 78, at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (stating that the Constitution's "[l]imitations . . . can be preserved in practice no other way than through the medium of courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all reservations of particular rights or privileges would amount to nothing"); The Federalist No. 43, at 274 (James Madison) ("[A] right implies a remedy."). That principle extended to the Bill of Rights. When

3

these amendments were introduced in 1789, James Madison explained that it was "independent tribunals of justice" that would be "in a peculiar manner the guardians of those rights." 1 Annals of Cong. 457 (1789) (Joseph Gales ed., 1834).

In *Marbury v. Madison*, Chief Justice Marshall recognized that Article III gave federal courts the power to uphold this principle. Invoking Blackstone, whose Commentaries were "frequently referred to" by the Framers, *Nelson v. Carland*, 42 U.S. 265, 272 (1843) (Carton, J., dissenting), the Chief Justice wrote that "[i]t is a settled and invariable principle, that every right, when withheld, must have a remedy, and every injury its proper redress," 5 U.S. (1 Cranch) 137, 147 (1803); *see also id.* at 163 (emphasizing that "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury"); *id.* (it is a "general and indisputable rule, that where there is a legal right, there is also a legal remedy, by suit or action at law, whenever that right is invaded") (quoting 3 William Blackstone, *Commentaries on the Laws of England*, at 23 (1768)).

In other words, "[f]rom the earliest years of the Republic, the Court has recognized the power of the Judiciary to award appropriate remedies to redress injuries actionable in federal court." *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 66 (1992). Even if this power was "not to be found in express terms in any part of the constitution," it was "given by implication, as a power necessary and proper to carry into effect [the] express power," *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 349 (1816), that federal courts had under Article III to hear "all cases,

in law and equity, arising under the Constitution." U.S. Const., art. III, § 2. Such power was necessary because without it, "there would, in many cases, be rights without corresponding remedies." *Martin*, 14 U.S. at 350; *see also Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 624 (1838) (it would be a "monstrous absurdity in a well organized government, that there should be no remedy, although a clear and undeniable right should be shown to exist").

At the Founding, unconstitutional action by federal officers was addressed in one of two ways: An individual could bring a state-tort claim for damages for past violations, *see Little v. Barreme*, 6 U.S. (2 Cranch) 170, 179 (1804), or he could sue to enjoin ongoing or future ones, *see Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477, 491 n.2 (2010) (equitable relief "has long been recognized as the proper means for preventing entities from acting unconstitutionally" (quoting *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 74 (2001))). "The ability to sue to enjoin unconstitutional actions by state and federal officers," in particular, was a "creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong*, 575 U.S. at 327. And unlike a damages claim, which required a preexisting cause of action, equity jurisdiction existed anywhere a "wrong [wa]s done, for which there is no plain, adequate, and complete remedy." 1 Joseph Story, *Commentaries on Equity Jurisprudence as Administered in England and America* § 49 (14th ed. 1918). Thus, federal courts sitting in equity have long stepped in with injunctive relief "to arrest the injury, and prevent the wrong." *Osborn v. Bank of United States*, 22 U.S. (9

5

Wheat.) 738, 845 (1824). Consistent with this broad power to act when equity requires, the Supreme Court long ago recognized that "a court of equity is the proper tribunal to prevent an injurious act by a public officer, for which the law might give no adequate redress." *Carroll v. Safford*, 44 U.S. (3 How.) 441, 463 (1845).

**B.** *Bivens* was "decided against [this] rich doctrinal background," in which state tort law and federal courts sitting in equity provided independent mechanisms for holding federal officers accountable for constitutional violations. Stephen I. Vladeck, *The Disingenuous Demise and Death of* Bivens, 2019-2020 Cato. Sup. Ct. Rev. 263, 271 (2020). At issue was whether the Court should recognize an *additional*, implied "cause of action for damages" under the Fourth Amendment. *Bivens*, 403 U.S. at 389. The government argued it should not because the petitioner there already had an alternative and adequate remedy: "an action in tort, under state law, in the state courts." *Id.* at 390. But, at the same time, even the Solicitor General was careful to recognize that when there was no remedy for a constitutional violation, either through state common law or federal equitable principles, the court "had the power— and obligation—to fashion such relief on their own and, indeed, that they had been doing so for decades." Vladeck, *supra*, Cato Sup. Ct. Rev. at 271 (citing *Bivens*, Brief for Respondents, 1970 WL 122211, at *19, 24, 40)). The question, then, was whether an implied cause of action under the Constitution was "necessary." *Bivens*, 403 U.S. at 407 (Harlan, J., concurring). To the Court in *Bivens*, the answer was clear. *Id.* at 397 (holding that there was such an implied right of action).

6

For a decade, the Supreme Court expanded *Bivens*, holding that its reasoning applied to certain claims brought under the Fifth Amendment, *Davis v. Passman*, 442 U.S. 228 (1979), and the Eighth, *Carlson v. Green*, 446 U.S. 14 (1980).[2] That changed after *Carlson*. "For the past 45 years, the Court has consistently declined to extend *Bivens* to new contexts," *Goldey v. Fields*, 606 U.S. 942, 945 (2025) (per curiam), rendering it "effectively dead," Danielle C. Jefferis, *RIP Bivens*, 103 Neb. L. Rev. 1, 2 (2024). Still, it has never been in doubt that if the choice for a constitutional violation is a remedy "or nothing," the answer cannot be nothing—particularly where, as here, a writ of habeas corpus pursuant to  28 U.S.C. § 2241 provides a ready alternative.

**C.** Despite these broad principles, the district court denied Mr. Tomkins's habeas petition under Section 2241, holding that he must instead file a "civil rights suit." S.A. at 1. In doing so, it relied on *Glaus*, in which this Court held that a federal prisoner challenging "the conditions under which he is being held" could not proceed through habeas but must instead "use" a "*Bivens* theory." 408 F.3d at 386. But in light of the modern-day demise of *Bivens*, relying on the practically nonexistent availability of a *Bivens* action to deny Mr. Tomkins habeas relief would leave federal

---

[2] In 1988, relying on the continued availability of other "civil action[s] . . . for . . . violation[s] of the Constitution of the United States," Congress preempted many state tort remedies, channeling these claims into the Federal Tort Claims Act. Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub. L. No. 100-694, § 5, 102 Stat. 4563, 4564 (codified at 28 U.S.C. § 2679(b)(2)(A)). Congress was careful to emphasize in this statute, better known as the Westfall Act, that its preemption provision "does not extend to a civil action against an employee of the Government which is brought for a violation of the Constitution of the United States." *Id.* § 2679(b)(1)(A).

prisoners like him with rights on paper but no remedies in practice—turning foundational Article III principles upside down.

Indeed, the possibility that federal prisoners could challenge unconstitutional conditions of confinement through habeas was part of why the Supreme Court in *Ziglar v. Abbasi*, 582 U.S. 120, 145 (2017), refused to recognize a *Bivens* claim in that context. Six men, most of Arab descent, were arrested during the government's post-September 11 investigation and held in solitary confinement for months. *Id*. at 128. They attempted to bring conditions of confinement claims under the Eighth Amendment through *Bivens*. *Id*. at 129. Although the Court refused to recognize such a *Bivens* claim, it noted—twelve years after this Court's decision in *Glaus*—that the plaintiffs could potentially "challenge their confinement conditions via a petition for a writ of habeas corpus." *Id*. at 144 (collecting cases). Though the Court acknowledged that it had never squarely decided whether the Great Writ could be used in that way, it reasoned that a federal prisoner could bring a habeas petition to challenge the conditions of his confinement "if necessity required its use." *Id*. at 145. It was precisely *because* the plaintiffs in *Ziglar* could have brought habeas petitions—which, the Court noted, "would have required officials to place [them] in less-restrictive conditions immediately"—that the Court determined an implied damages remedy was unnecessary. *Id*.

This Court should take up *Ziglar*'s invitation and hold that habeas relief, as authorized under statute, remains available as an equitable backstop for federal prisoners where federal common law, like *Bivens*, has become "disfavored." *Id*. at 135

8

(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Doing so would be consistent with Founding-era principles, the Supreme Court's *Bivens* jurisprudence, and—as Mr. Tomkins points out—the historical understanding of habeas as a "flexible, equitable doctrine that grants federal courts broad power to remedy 'all manner of illegal detention.'" Appellant's Br. at 12 (quoting *Harris v. Nelson*, 394 U.S. 286, 291 (1969)). Because habeas, as authorized by Congress, is more than flexible enough to give a court jurisdiction "to prevent an injurious act by a public officer, for which the law might give no adequate redress," *Carroll*, 44 U.S. at 463, this Court should reconsider *Glaus* and allow Mr. Tomkins's habeas petition to proceed.

## II.    To Vindicate Their Constitutional Rights, Federal Prisoners Must Have Access To Mail.

Allowing Mr. Tomkins's petition to proceed is all the more important because it concerns access to mail, which plays an irreplaceable role in rehabilitation and reform by enabling incarcerated people to form connections, maintain contact with loved ones, and practice religion. Legal mail, in particular, is a critical lifeline between incarcerated persons and the courts. Indeed, the restrictive mail policies Mr. Tomkins challenges have in fact obstructed his access to court—and they will continue to harm him and other individuals incarcerated at FCI Thomson absent the injunctive relief sought by Mr. Tomkins.

**A**. Both this Court and the Supreme Court have long held that incarcerated individuals have protected First Amendment interests in sending and receiving mail. *See, e.g.*, *Thornburgh v. Abbott*, 490 U.S. 401, 407-08 (1989) (collecting cases); *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999) ("The Supreme Court has recognized that

9

prisoners have protected First Amendment interests in both sending and receiving mail."); *Martin v. Brewer*, 830 F.2d 76, 77 (7th Cir. 1987) ("The free-speech clause of the First Amendment has been held to have some application to communications with and among prison inmates . . . ."). For good reason. Not only is mail access essential to safeguard incarcerated individuals' other constitutional rights, *see infra* Part II.B, it is indispensable for them to maintain connections with the outside world, to their own benefit and the benefit of society writ large.

For starters, numerous academic and public health studies have confirmed that greater community and familial connection throughout incarceration, including through letter writing, is associated with better post-incarceration adjustment.[3] By way of example, many incarcerated people use mail to send emotionally significant artworks to loved ones, advocacy groups, journalists, and more.[4] Each piece represents a window into life while incarcerated and reminds both the sender and receiver that the other is still there. Ultra-restrictive mail policies like those at FCI

---

[3] *See* Alice Galley et al., *New Prison Mail Policies Reduce Already Limited Connections for Incarcerated People*, Urban Institute (Dec. 19, 2022) https://www.urban.org/urban-wire/new-prison-mail-policies-reduce-already-limited-connections-incarcerated-people [https://perma.cc/9MS5-PNBB]; Leah Wang, *Research Roundup: The Positive Impacts of Family Contact for Incarcerated People and Their Families*, Prison Policy Initiative (Dec. 21, 2021), https://www.prisonpolicy.org/blog/2021/12/21/family_contact/ [https://perma.cc/M7PV-ZM9Q].

[4] "People in prison often describe their artwork as a 'thoughtful' use of their time. It is a way to inject purpose into hours otherwise spent in a restrictive environment. Each piece of art feels like a quiet statement: *'I am still here, still thinking, still creating, and living in ways you might not expect.'*" 4 Aala Abdullahi, *My Year of Reading Letters From Prisoners*, Marshall Project (Dec. 16, 2024), https://www.themarshallproject.org/2024/12/16/prison-penpal-jail-letters-mail [https://perma.cc/72R9-RQAD].

Thomson risk harming incarcerated individuals' mental wellbeing, exacerbating a sense of isolation, and inhibiting their ability to reintegrate into their communities post-release.

Mail is also important for meaningfully preparing for potential release from prison. People incarcerated use the mail to correspond with rehabilitation and reentry programs, which are key to preventing recidivism and reducing crime.[5] Mail also plays a crucial role in enabling incarcerated people to develop and deepen religious connections, which further reduce recidivism and promote rehabilitation.[6] Thus, as the Supreme Court recognized over half a century ago, "the weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation." *Procunier v. Martinez*, 416 U.S. 396, 412 & n.13 (1974), *overruled in part on other grounds by Thornburgh*, 490 U.S. 401.

---

[5] Leah Sakala, *Return to Sender: Postcard-Only Mail Policies in Jail* (Feb. 7, 2013), Prison Policy  Initiative, https://www.prisonpolicy.org/postcards/report.html [https://perma.cc/ZLD8-8URR].

[6] *See, e.g.*, Byron R. Johnson, *Religious Participation and Criminal Behavior, in Effective Interventions in the Lives of Criminal Offenders* 3, 4-7 (J.A. Humphrey & P. Cordella eds., 2014) (reviewing studies finding that incarcerated persons involved in religious programming were less likely to be rearrested after release and less likely to experience negative emotions and engage in destructive behavior); Thomas P. O'Connor & Michael Perreyclear, *Prison Religion in Action and its Influence on Offender Rehabilitation*, 35 J. Offender Rehab. 11, 26, 28 (2002) (finding that more religious involvement reduced the number of incarcerated persons' infractions; referencing research findings that in-prison infractions are predictor of recidivism); Christopher P. Salas-Wright *et al.*, *Buffering Effects of Religiosity on Crime: Testing the Invariance Hypothesis Across Gender and Developmental Period*, 41 Crim. Just. & Behav. 673, 674, 688 (2014) ("Simply, the body of evidence seems to point to a straightforward empirical conclusion that 'more religion' is associated with 'less crime'").

These principles apply with particular force for incarcerated persons with specialized needs. For instance, the United Nations Office on Drugs and Crime has identified the following populations of incarcerated persons with special needs for whom contact with the outside community is particularly important: (1) persons with mental health care needs, for whom "regular and meaningful contact with family members and friends through . . . correspondence" is "fundamental"; (2) persons with disabilities, for whom the "opportunity to participate in programmes designed for their needs and increase contact between the prisoners and the outside world" will "have a beneficial effect on their mental well-being"; (3) ethnic and racial minorities, for whom "continuing contacts with the community is likely to be of particular importance, due to their sense of alienation and isolation within the system, and the higher level of distress experienced as a result of breaking ties with the community in some cultures"; and (4) lesbian, gay, bisexual, and transgender persons, for whom the United Nations recommends that prison authorities make "special efforts to facilitate their contact with the outside world" "[d]ue to the likelihood of limited contact with family and relatives."[7]

Importantly, when mail access is restricted—and the support it provides is lost—other means of communication cannot fill the void. FCI Thomson, like other prisons, restricts in-person visiting hours, frequently suspends in-person visitation

---

[7] United Nations Office on Drugs and Crime, *Handbook on Prisoner with Special Needs* 36, 52, 73, 116 (2009), https://www.unodc.org/pdf/criminal_justice/Handbook_on_Prisoners_with_Special_Needs.pdf [https://perma.cc/EN83-J6PN].

due to unforeseen circumstances, and is located prohibitively far away from many incarcerated people's family members and communities.[8] Access to phone calls may be restricted; individual calls are generally time-limited; and even brief calls may prove unaffordable for many incarcerated people, who can earn as little as 12 cents per hour of work.[9] Similarly, if federally incarcerated individuals are provided access to an electronic mail system, they will be charged by the minute to compose and send messages, with limits on length and no attachments permitted.[10]

**B.** For these reasons and others, the First Amendment safeguards mail access in prisons as a general matter. But legal mail is entitled to even greater protection

---

[8] *See, e.g.*, U.S. Dep't of Justice, *Institution Supplement TOM 5267.09J: Visiting Regulations* (June 24, 2025), https://www.bop.gov/locations/institutions/tom/tom_visit.pdf [https://perma.cc/T5V7-4L25] (restricting visiting hours and permissible visitors at FCI-Thomson); Haley Ryan, *Thomson Prison on Lockdown Since Sunday*, KWQC (Mar. 11, 2025), https://www.kwqc.com/2025/03/11/thomson-prison-lockdown-since-sunday/ [https://perma.cc/PBW6-ASG9]; *Thomson Prison Suspends Visitation After Whooping Cough Case*, KWQC (Aug. 1, 2025), https://www.kwqc.com/2025/08/01/thomson-prison-suspends-visitation-after-whooping-cough-case/ [https://perma.cc/QFQ8-4U3X]; Walter Pavlo, *Federal Inmates Find Themselves Far From Home Despite First Step Act*, Forbes (Sept. 25, 2025), https://www.forbes.com/sites/walterpavlo/2025/09/25/federal-inmates-find-themselves-far-from-home-despite-first-step-act/ [https://perma.cc/7UAS-QHDM].

[9] *See, e.g.*, U.S. Dep't of Justice, *Program Statement P5264.08: Inmate Telephone Regulations* (Jan. 24, 2008), https://www.bop.gov/policy/progstat/5264_008.pdf [https://perma.cc/U8Z9-CD4X]; Ben Blatt, *F.C.C. Changes Course on the Price of Prisoners' Phone Calls*, N.Y. Times (Oct. 28, 2025), https://www.nytimes.com/2025/10/28/upshot/prisoners-phone-calls-prices.html [https://perma.cc/YUU9-XH8S]; Fed. Bureau of Prisons, *Work Programs*, https://www.bop.gov/inmates/custody_and_care/work_programs.jsp [https://perma.cc/TE9L-FTQM] (noting that incarcerated individuals with access to work assignments "earn 12¢ to 40¢ per hour").

[10] *See* Fed. Bureau of Prisons, *Community Ties*, https://www.bop.gov/inmates/communications.jsp [https://perma.cc/MW63-27GW] (explaining that federal prisons generally use TRULINCS).

because of the potential for interference with incarcerated individuals' right of access to the courts—the crucial right that enables them to protect all other rights. *Rowe*, 196 F.3d at 782. The Supreme Court has long protected incarcerated individuals' constitutional right of access to the courts through mail, especially because mail is often the only avenue for them to present their claims to the judiciary. *See, e.g.*, *Bounds v. Smith*, 430 U.S. 817, 821 (1977); *Wolff v. McDonnell*, 418 U.S. 539, 576 (1974); *Ex parte Hull*, 312 U.S. 546, 549 (1941). In particular, people who seek to represent themselves while incarcerated—which is almost always the case[11]—are uniquely beholden to the carceral mail system because they can only access the courts via paper. Here especially, the courthouse and mailroom doors are functional equivalents for incarcerated persons.

Consider, for instance, the importance of mail in the context of habeas corpus proceedings, which are already "governed by a set of strict deadlines, byzantine procedural default rules, and a body of jurisprudence that is quite complex." *Conner v. Reagle*, 82 F.4th 542, 543 (7th Cir. 2023). With limited exceptions, there is no constitutional right to counsel in post-conviction collateral proceedings. *Coleman v. Thompson*, 501 U.S. 722, 755–57 (1991). So, nine times out of ten, an incarcerated

---

[11] The rate of pro se plaintiffs in "prisoner civil rights" cases is roughly 95%, and the rate in habeas petitions is roughly 89%. Margo Schlanger, *Trends in Prisoner Litigation, as the PLRA Enters Adulthood*, 5 UC Irvine L. Rev. 153, 167 (2015). These rates have "remained remarkably consistent from 1999 to 2018," and contrary to popular opinion, pro se filings have not been increasing over the past few decades. Mark D. Gough & Emily S. Taylor Poppe, *(Un)Changing Rates of Pro Se Litigation in Federal Court*, 45 L. & Soc. Inquiry 567, 575–76 (August 2020).

person challenging the constitutionality of their confinement goes at it alone.[12] But mail restrictions can severely impede an incarcerated person's ability to build their case: A letter from a coerced witness who is ready to come forward with the truth, or a final order relevant to prove exhaustion, could make it to the prison mailroom and no further. And delays resulting from mail restrictions can prove dispositive because, for example, the Antiterrorism and Effective Death Penalty Act ("AEDPA") imposes a strict one-year statute of limitations, *see* 28 U.S.C. § 2244(d)(1); 28 U.S.C. § 2255(f), and requires a tough showing of "extraordinary circumstances" to justify equitable tolling, *Conner*, 82 F.4th at 550. Thus, the consequences of even one mailroom error or obstruction can mean the difference between freedom and a lifetime incarcerated.

As a result, when access to legal mail is threatened, incarcerated people risk losing their constitutional right to meaningful access to the courts and, in turn, risk losing any ability to protect their other rights. This Court has long recognized as much. *See Gaines v. Lane*, 790 F.2d 1299, 1308 (7th Cir.1986) (noting the connection between legal mail and access to the courts). It is why indigent incarcerated people seeking to engage in their own legal representation must be provided with "paper and pen to draft legal documents" and "stamps to mail them." *Bounds*, 430 U.S. at 824–25, *abrogated on other grounds by Lewis v. Casey*, 518 U.S. 343 (1996). The importance of mail to accessing the courts is why both this Court and district courts exempt unrepresented litigants from electronic filing requirements. 7th Cir. R. 25(b); *see also, e.g.*, N.D. Ill. R. 5.2(a). And it is why the Supreme Court, the Federal Rules,

---

[12] Gough, *supra* note 11 at 576.

15

and several states have adopted prison mailbox rules, recognizing the particular difficulties faced by pro se incarcerated petitioners who "cannot personally travel to the courthouse" or "take any of the[] precautions" reasonably employable by people not incarcerated, and who therefore have "no choice but to entrust the forwarding of [their] [filings] to prison authorities . . . who may have every incentive to delay." *Houston v. Lack*, 487 U.S. 266, 271 (1988); *see also, e.g.*, *Ray v. Clements*, 700 F.3d 993, 1003 (7th Cir. 2012); Fed. R. App. P. 4(c) & 25(a)(2)(A)(iii); U.S. Sup. Ct. R. 29.2; Ill. Sup. Ct. R. 12(b)(6).[13] Behind these rules is a recognition that prison legal mail lies at the heart of any incarcerated person's access to the courts.

**C.** FCI Thomson's restrictive mail policy risks closing the courthouse door to its incarcerated population. It prohibits individuals from receiving mail enclosed in anything but white envelopes. Appellant's Br. at 6. It refuses to deliver mail that is over five pages. *Id.* And it rejects mail with any labels or markings. *Id.* Of course, people incarcerated at FCI Thomson have no control over the format in which mail is sent to them. But, even more critically, these requirements for incoming mail are wholly incompatible with the typical format of legal filings and court correspondence. A court order could be printed double-sided. It may be longer than five pages. A court clerk may mail the order in a manila envelope rather than a white one. In each of those cases, FCI Thomson would reject the mailed order, leaving the incarcerated

---

[13] *See* Catherine T. Struve, *The Federal Rules of Inmate Appeals*, 50 Ariz. St. L.J. 247, 274–80 (2018), for more on the incorporation of *Houston* into federal procedural rules.

16

person without his legal correspondence from the court by no fault of his own. He could then lose the ability to petition or appeal the outcome of the court decision.

That is what happened to Mr. Tomkins. He never received the court order denying his pro se motion for a reduction of his sentence. Appellant Br. at 9. He only learned of the court's decision fifty days later, after coming across the order on an electronic law library computer. *Id.* And by that time, the time to file a notice of appeal had already expired. *Id.* Because of the restrictions on mail and his resulting inability to receive the court's order, Mr. Tomkins was unable to timely appeal the court's decision even though he had no control over the format in which the court mailed him its order. *Id.* FCI Thomson's mail restrictions, in this way, closed the courthouse doors to Mr. Tomkins. And unless Mr. Tomkins can challenge these unconstitutional mail restrictions in his habeas petition, incarcerated individuals at FCI Thomson will continue to be barred from the legal processes to which they are constitutionally entitled.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's order dismissing Mr. Tomkins's habeas petition.

Dated: March 24, 2026                Respectfully submitted,

/s/ *Leah Nicholls*
Leah Nicholls
  *Counsel of Record*
Ana M. Builes
Lavanya Prabhakar
PUBLIC JUSTICE
1620 L St. NW, Ste. 630

17

Washington, DC 20036
(202) 470-1061
lnicholls@publicjustice.net

Jacqueline Arkush
PUBLIC JUSTICE
14th St., Ste. 610
Oakland, CA 94612
(510) 622-8150

Amit Jain
RODERICK & SOLANGE
MACARTHUR JUSTICE CENTER
501 H Street NE, Suite 275
Washington, DC 20002
(202) 869-3434

*Counsel for Amici Curiae*

18

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29 and 27(d)(2) because it contains 4,750 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 12-point Century Schoolbook font.

Dated: March 24, 2026

/s/ *Leah M. Nicholls*
Leah M. Nicholls

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2026, I electronically filed the foregoing document using the Court's Appellate Case Management System, causing a notice of filing to be served upon all counsel of record.

Dated: March 24, 2026 /s/ *Leah M. Nicholls*
Leah M. Nicholls

*Counsel for Amici Curiae*